CLARENCE L. BOSTIAN, JR., FRANKLIN TOWNSHIP TAXPAY-ERS ASSOCIATION, INC., PLAINTIFFS, v. FRANKLIN STATE BANK AND TOWNSHIP OF FRANKLIN, DEFENDANTS.

Tax Court of New Jersey

April 3, 1980.

*Leo Rosenblum* for plaintiffs.

*Norris, McLaughlin & Marcus,* by Richard A. Norris for defendant Franklin State Bank.

CRABTREE, J. T. C.

Plaintiffs disputed the valuation of property in Franklin Township owned by defendant bank, asserting that the township assessor had undervalued the property for the tax year 1972. The Division of Tax Appeals (Division) upheld the assessment and increased it to the extent that the assessor had omitted certain items of bank fixtures and equipment which were found to be part of the realty.

Plaintiffs and the defendant bank appealed to the Appellate Division, which entered its decision on May 4, 1979, *Bostian v. Franklin State Bank,* 167 *N.J.Super.* 564, 401 *A.*2d 549 (App. Div.1979). The appellate tribunal, in the main, affirmed the Division but remanded the case for additional findings with respect to the proper rate of depreciation and the extent of functional obsolescence as well as a more detailed statement of the basis of the trial judge's determination that certain items of bank fixtures and equipment formed part of the realty.

Although the case was tried in the Division of Tax Appeals, all that agency's cases, with immaterial exceptions, have been transferred to the Tax Court.

## Depreciation

The building in question was one year old on the valuation date (October 1, 1971) and all three experts agreed that an allowance for depreciation was appropriate; they differed only on the rate. Plaintiffs' expert assigned a 60–year useful economic life, while the bank's expert concluded that a 50–year life

was proper. I am persuaded, from a review of the record, that the bank's expert is correct. While plaintiffs' expert purported to base his judgment on the useful economic life of the bank building, it is clear from his testimony that his opinion was predicated exclusively on the physical life of the structure, with no consideration given to functional or economic obsolescence. The leading authority in this field indicates that the physical concept of value is incomplete without consideration of functional and economic obsolescence. *American Institute of Real Estate Appraisers, The Appraisal of Real Estate* (7 ed. 1978), 243. Moreover, plaintiff's expert admitted that the useful lives of certain significant components of the improvements were less than 60 years. In view of the rapid economic and technological changes that characterize modern life, I find it more persuasive that this commercial structure has a useful economic life of 50 years.

Accordingly, I find that the accumulated depreciation for the first year as at the valuation date (October 1, 1971) is 2% of $1,360,447 (the assessor's value accepted by the Division and upheld on appeal) or $27,209.

## FUNCTIONAL OBSOLESCENCE

The opinion of the Appellate Division defined functional obsolescence as the loss in value resulting from conditions within the building itself and observed that the terms "superfluity," "duplication of facilities" and "overbuilding" are used to describe buildings whose functional characteristics exceed reasonably foreseeable demands. Put another way, functional obsolescence refers to the adverse effect on value resulting from design defects that impair utility. *American Institute of Real Estate Appraisers, op. cit.* at 251. The appeals tribunal also alluded to indications in the record of over–improvements and features uniquely designed for the special purpose of a home office bank building and which might not be recoverable as part of a fair market price. Those alleged over–improvements and features, said the Appellate Division, should have been considered by the trial judge, who was also directed to consider the

opinion of the bank's expert allocating an allowance of 10% for functional obsolescence.

Applying the definitions of functional obsolescence set forth in the Appellate Division opinion and in the authoritative text cited above, I find that the bank has failed to make a case for functional obsolescence. Notwithstanding extensive testimony concerning the alleged overbuilt nature of the bank structure, the bank's president testified that he considered the building "just about" functional for its purposes as presently constructed. He also acknowledged that the building was designed to impress the public, certainly no small consideration in an industry as competitive as banking. Moreover, the bank's expert indicated that the highest and best use for the building was its present use, *i.e.*, as a bank. Finally, the bank president indicated that, as of the time of trial, the building's quarters had become cramped, a condition that hardly supports the claim of an overbuilt facility.

■ As for the opinion of the bank's expert allocating an allowance of 10% for functional obsolescence, I find that his opinion is contradicted by the testimony of the bank president hereinabove referred to; accordingly, I must reject the expert's conclusion as it is contrary to the facts. The determination of the weight to be given the testimony of an expert witness is for the trier of fact, and that weight depends, among other things, upon the facts and reasoning which form the foundation of the expert's opinion. *In re Port of N.Y. Authority,* 28 *N.J.Super.* 575, 101 *A.*2d 365 (App.Div.1953); *Passaic v. Gera Mills,* 55 *N.J.Super.* 73, 150 *A.*2d 67 (App.Div.1959), certif. denied 30 *N.J.* 153, 152 *A.*2d 171 (1959).

## FIXTURES AND EQUIPMENT AS REALTY

The Division found that certain items of fixtures and equipment, namely, vault doors, tellers' counters, safe deposit boxes, night depository and pneumatic tube system, valued at $150,000 in the aggregate, constituted part of the realty and therefore should have been included in the determination of value.

Defendant Bank appealed this finding with respect to the vault doors, tellers' counters and safe deposit boxes, accepting, apparently, the Division's findings concerning the night depository and pneumatic tube system. The aggregate value of the three items in issue is $88,000.

The Business Personal Property Tax Act excludes from taxation thereunder "goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto". *N.J.S.A.* 54:11A–2(b)(2). While the New Jersey Supreme Court recast the "material injury" test and abrogated the so–called "institutional doctrine"[1] in the process in *Bayonne v. Port Jersey Corp.*, 79 *N.J.* 367, 399 *A.2d* 649 (1979), there remains for construction the apparent legislative purpose underlying the antecedent phrase "goods and chattels so affixed to real property as to become part thereof." This phrase may only be construed in terms of the basic law of fixtures, *i.e.*, determination of the point at which chattels affixed to realty lose their identity as chattels and become part of the realty. The three–fold test by which fixtures are adjudged was set out in the leading case of *Teaff v. Hewitt*, 1 *Ohio St.* 511 (Sup.Ct.1853), wherein the Ohio Supreme Court concluded that a movable chattel loses it character as personalty and becomes a fixture passing with the realty when it is (1) physically affixed to the realty or some part thereof, (2) appropriated to the use or purpose of that part of the realty to which it is affixed and (3) the party making the annexation intends a permanent accession to the freehold.

It is important to observe at this juncture that the classification of property as realty or personalty for tax purposes may differ from classification for other purposes. *Trabue Pittman Corp. v. Los Angeles Cty.*, 29 *Cal.2d* 385, 175 *P.2d* 512

---

[1]The institutional doctrine is merely a definition of material injury, *i.e.*, the functional essentiality of the chattel to the use of the realty to which it was attached, so that removal of the chattel effectively precludes usage of *National Lead Co. v. Sayreville*, 132 *N.J.Super.* 30, 331 *A.2d* 633 (App.Div. 1975).

(Sup.Ct.1946); *Roseville Pottery v. County Bd. of Revision,* 149 *Ohio St.* 589, 77 *N.E.*2d 608 (Sup.Ct.1948); *Consolidated Edison Co. of New York, Inc. v. City of N. Y.,* 44 *N.Y.*2d 536, 406 *N.Y.S.*2d 727, 378 *N.E.*2d 91 (Ct.App.1978); 5 *Powell on Real Property* (1979 Ed.) par. 660 at 96.6. The rights of private parties under Article 9 of the Uniform Commercial Code, *N.J.S.A.* 12A:9–301 *et seq.,* the Motor Vehicle Act or real property leases are not determinative in this regard. *Trabue Pittman Corp. v. Los Angeles Cty., supra; Ayrshire Coal Co. v. Property Tax Appeal Bd.,* 19 *Ill.App.*3d 41, 310 *N.E.*2d 667 (Ct.App.1974); *Koester v. Hunterdon Cty. Bd. of Tax.,* 79 *N.J.* 381, 394–395, 399 *A.*2d 656 (1979). While, as the *Teaff* case indicates, the intent of permanent annexation is indispensable to a determination that a chattel has become a fixture, that intention must be judged by the physical facts or reasonably manifested outward appearances. Put another way, the intention test, objectively applied, means: what would a reasonable person consider part of the realty so as to pass with a deed or mortgage? This test promotes uniformity of taxation by permitting the assessor to rely upon external appearances. It also introduces certainty into the field of commercial leases. If both lessor and lessee understand that the addition of particular items will result in an increased real property tax assessment, suitable provisions can be included in the lease agreement concerning responsibility for the incremental property tax, even though such items remain the property of the lessee. See *Powell, op. cit., supra;* 5 *Am. Law of Property,* § 19.13 (1952).

■ Applying these principles to the three items in question, I find that the two vault doors (valued at $9,000 each) and the tellers' counter (valued at $30,000) constitute part of the realty for tax purposes, while the safe deposit boxes (valued at $40,000) are personalty and not taxable as part of the realty.

■ Although the bank president testified that the vault doors were movable and had, in fact, been removed from the bank's previous location without damage to the old building, there is nothing in the record to indicate that removal of vault doors was a common occurrence. It seems clear from the very

nature of vault doors that they were intended as a permanent addition to the realty. The vault itself is part of the realty and the conclusion is inescapable that a vault door, both functionally and physically, is integrated with the vault itself. Vaults and vault doors constitute a unit for use together and are improvements to the realty.[2] *San Diego Trust & Savings Bank v. San Diego Cty.*, 16 *Cal.*2d 142, 105 *P.*2d 94 (1940). In that case the California Supreme Court held that bank vault doors were part of the realty for tax purposes, saying:

> The mere fact that said doors can be removed without material damage to the vaults by chipping away with a chisel, jack hammer, or compressed air hammer, the cement grouting which attaches them to the vaults, does not alone establish their character as articles of personalty. A door or window in an ordinary dwelling house can be removed with very little damage to the realty. It also may be replaced by one of different design or by a new one if the former should become broken or defective, but no one would contend that either was not a part of the realty by reason of these facts alone. [105 *P.*2d at 98]

■ As for the tellers' counters, it is clear from the record that, although the counters were movable, they were part of the bank's design and were intended to remain permanently subject only to change in the bank's mode of doing business or in the event the items become obsolete. They were also affixed to the concrete. Thus, as with the vault doors, the counters were functionally and physically integrated with the single–purpose bank building and formed part of the realty. Intent and use, not the manner of physical attachment, are the main determinants of whether or not certain items are taxable as realty or personalty. *Koester v. Hunterdon Cty. Bd. of Tax., supra.*

The safety deposit boxes, some 2,500 in number and valued at $15 each, were not physically attached to the bank building and were readily removable. Although functionally integrated with

---

[2]The courts of Ohio and New York distinguish between property devoted to the conduct of a business and property indispensable to the realty itself. California makes no such distinction. While I am not prepared to accept the California doctrine in this respect, the distinction in the case at bench is meaningless, as the uncontroverted evidence indicated that the bank was constructed as a single purpose building. *Cf. Anaconda Co. v. Perth Amboy,* 157 *N.J.Super.* 42, 384 *A.*2d 531 (App.Div.1978) (equipment in electrolytic copper refinery).

the bank's operation, the absence of physical attachment precludes classification of these items as realty. Some degree of physical annexation is required. *Pajaro Valley Bank v. Santa Cruz Cty.,* 207 *Cal.App.*2d 621, 24 *Cal.Rptr.* 639 (D.Ct.App.1962).

The foregoing discussion stresses the functional integration aspect of the realty–personalty classification issue. As indicated, the distinction between functional essentiality to the realty and functional indispensability to the business conducted on the realty is without meaning in this case, as the bank building is a single–purpose structure. I consider it important, however, to declare my views on the distinction and to set forth the position to be taken in future cases.

The California and Illinois courts conclude that functional essentiality (given some degree of physical attachment) to the conduct of a business is sufficient to classify an item as real property for tax purposes. The Supreme Court of Ohio, on the other hand, distinguishes between functional integration with the business and functional integration with the realty irrespective of the business conducted thereon. Items of property integrated with the business only are treated for tax purposes as personalty, while items integrated with the realty generally are taxable as real property. *Zangerle v. Standard Oil Co.,* 144 *Ohio St.* 506, 60 *N.E.*2d 52 (Sup.Ct.1945); *Zangerle v. Republic Steel Corp.,* 144 *Ohio St.* 529, 60 *N.E.*2d 170 (Sup.Ct.1945). The Ohio Supreme Court rationalizes the distinction by reference to a statutory policy of encouragement to new industry and expansion of existing businesses given the significantly lower rates associated with business personal property taxation. *Roseville Pottery v. Cty. Bd. of Revision, supra.*

The approach of the Ohio cases is consistent with the underlying legislative purpose of the New Jersey Business Personal Property Tax Act. That purpose was to relieve machinery and equipment used in business from the burden of local *ad valorem* taxation. Such taxation presented problems of tax equity because of the disparity of local rates and assessment practices and also constituted an obstacle to business investment. The legisla-

tive aim to relieve business machinery and equipment from the burden of local property taxation was a primary ground for the New Jersey Supreme Court's conclusion that massive cranes used to load and unload containerships and readily movable from specially constructed rails to barges constituted personalty for tax purposes. *Bayonne v. Port Jersey Corp., supra.*

I conclude from the foregoing that the Legislature did not intend to abolish the classical fixtures test in classifying property as personalty or realty for tax purposes. This is essentially the Ohio test which takes into account the business use of property in determining the requisite intention regarding permanent annexation. The recast definition of material injury embodied in the *Port Jersey* case does not derogate from the three–fold test of the *Teaff* case. Indeed, it is clear from the facts in *Port Jersey* that the cranes were not physically attached to any structure constituting part of the realty.

Having found that the vault doors and the tellers' counters are fixtures for tax purposes, I also find that the assessable value of those items must be calculated in accordance with the valuation method applied to the building by the assessor of the defendant municipality and accepted by both the Division of Tax Appeals and the Appellate Division.

The foregoing findings and conclusions will result in an assessment of $829,314, computed as follows:

COMPUTATIONS

| | | |
|---|---|---|
| 1. Land—not in dispute | | $ 214,700 |
| 2. Value of improvements | | |
| Cost of building | 1,360,447 | |
| x .98 (less 2% depreciation) | 27,209 | |
| | | $1,333,238 |

COMPUTATIONS—Continued

Fixtures included 110,000
x 1.0268 (one years trending
          where 17 years
          compounded trending
          equal 1.57)                      112,948
x   .98 (less 2% depreciation)
        equal 110,689.04 say                       110,689

        Total Improvements                                    $1,443,927

SUMMARY

| | |
|---|---|
| Land | $ 214,700 |
| Improvements | 1,443,927 |
| Final Value | 1,658,627 |
| Assessed Value (50%) | $ 829,314 |