CRABTREE, J. T. C.
Plaintiff seeks review of the following deficiency assessments in business personal property tax imposed by the defendant for the years 1968 through 1971:
*6 1968 1969 1970 1971
Tax $5,547.54 $ 8,794.51 $ 8,794.51 $ 9,096.72
Penalty 277.38 439.73 439.73 432.42
Interest (11/15/71) 2,302.23 2.594.38 1.538.93 475.67
Total Deficiency $8,127.15 $11,828.62 $10,773.17 $10.004.81
At issue is the characterization of bowling lanes and equipment as realty or personalty for purposes of the Business Personal Property Tax Act, N.J.S.A. 54:11A-1 et seq. Plaintiff contends that the property in question forms part of the real estate and is exempt from tax pursuant to N.J.S.A. 54:llA-2(b)(2).
Plaintiff owns and operates a bowling center in North Brunswick, New Jersey, consisting of 82 bowling alleys (or lanes) and ancillary equipment such as automatic pinsetters, ball returns, scoring tables, overhead projectors, ball racks and seats for bowlers and spectators. The center also offers a restaurant and cocktail lounge. A spacious paved parking lot adjoins the building; and three outdoor lighted signs (two attached to the external walls and one embedded in concrete in the parking area) proclaim the nature of the activity conducted within the building.
The older part of the building was erected in 1962, at which time 48 lanes were installed. Concrete was poured with forms to create a concrete foundation with channels running lengthwise. Then, 2 X 4s of 16' or random lengths were placed perpendicular to the channeling, 40" apart. The 2 X 4s were “ram-shot” or nailed with hard steel masonry nails approximately two inches into previously set concrete. The 2 X 4s were laid the entire width of the building, and the length that they traversed was 80'. On top of the 2 X 4s and parallel to the channeling were placed three lengths of 2 X 4s for each alley, or a total of 146 running the full length of the alleys of 80', and those 2 X 4s were nailed to the 2 X 4s lying beneath them. Next, leveling strips were placed on top of the second set of 2 X 4s in order to produce a level concrete and wood foundation. They were IV2" to TVs" in thickness and shot with a transit. The *7 leveling strips were nailed on top of the second set of 2 X 4s at approximately 20" intervals. Then, cellotex, a waterproofing lining material, was placed on top of the leveling strips. The lanes were now built to fit on top of the concrete and wood foundation. The boards comprising the bowling surface were laid one on top of another up to 37", with a thickness of 23/i" and glued together. Next, the fastened boards were laid on their sides and fitted together “tongue and groove” and nailed. This was done for the entire 80' length of each alley and then the whole was dropped into the underlying cellotex. Finally, the alleys were attached to the wood foundation by screws at 40" intervals.
The 1969 installation was comprised of 34 lanes. Because of the peculiar configuration of the land, a basement had to be constructed and concrete slabs were placed and installed on top of the columns and girders of the basement. 2 X 4s were laid and placed widthwise in the same manner as in the 1962 installation and were nailed or “ram-shot” into the concrete slabs. 2 X 10s were placed lengthwise perpendicular to and on top of the 2 X 4s; there were three lengths of 2 X 10s for each alley, or a total of 102, and they were nailed to the underlying 2 X 4s. This was done to create the necessary height for channels for the ball returns. The next step in the process of building the wooden part of the foundation was installation of the leveling strips and of the cellotex, which was done in the same manner as in the 1962 installation. Wooden lanes that were previously installed in other establishments were purchased in sections of 23', I2Y2' and 30' for each alley. These were brought to Carolier Lanes, cleated, screwed together and dropped onto the cellotex as one piece. As the last step, the alleys were attached to their foundations by the employment of screws at 40" intervals in the same fashion as in the 1962 installation.
While both the original (1962) building and the 1969 extension are under the same roof, the floor of the extension is three steps lower than the floor of the older structure. Unlike the extension, the original structure has no basement. The lane furniture *8 and lane seating are comprised of steel-banded settees shot into the concrete flooring so as to be immovable. To remove them is to destroy them and to inflict severe damage on the floor as well.
The spectator seating is large and made to order to fit steps. Those seats are not shot into the flooring but they are exceptionally heavy.
The pinsetters are located in the rear of the lanes and their function is to clear the lanes of pins, reset the pins and return the ball. They are attached to the floors by means of 2 X 12s running the entire length of the building. The pinsetters are bolted and screwed to the 2 X 12s in a line, and the 2 X 12s are shot into the flooring. Removal of a pinsetter is extremely difficult, particularly a pinsetter located in the middle of an attached line of pinsetters. Indeed, removal of a pinsetter located in the middle of an attached line is impossible without destruction of a portion of the exterior wall of the building. The ball exits are part of the pinsetters.
The ball returns are made of plastic or metal and are affixed to the building by means of screws in 12"-wide boards. The boards, in turn, are “ram-shot” into the concrete flooring.
The escalifts are located at the front of the alleys in proximity to the bowler’s position, and they act as shock absorbers which stop the ball and elevate it to the ball terminal. The escalifts are sunk in concrete by shields and large bolts. They are, of necessity, solidly attached because of the punishment they are required to withstand.
If the 2 X 12s holding the pinsetters, the 12" boards holding the ball returns or the escalifts were removed, there would be damage to the concrete which would have to be repaired before another use could be made of the premises.
The ball terminals, which receive the balls from the escalifts and deliver it to the bowler, are annexed to wooden flooring by means of screws.
*9 The remaining items of equipment pertaining directly to the bowling activity itself, such as overhead projectors, scoring tables, electrical control counter, foul units and intercoms (which permit communication between the central desk, the bowlers and the pin spotter areas) are all attached in essentially the same fashion as the items hereinabove detailed.
There remain for consideration the furnishings and equipment in the restaurant and cocktail lounge, the glass doors and the three exterior signs.
The settees in the cocktail lounge were especially constructed to fit the contours of the odd shaped walls. They are fitted directly into the base of the building and they have no backs except the rough edges which fit under each window. They were affixed to the structure by being “ram-shot” into the floor and nailed to the walls. They are heavy and their removal would require three or four men and a crowbar. Upon removal the concrete flooring would have to be rebuilt and, in addition, the wall would be torn out where the aluminum window meets the floor, necessitating rebuilding.
The mica bar countertops are a composite specially bonded to the bars. The bars in the building are affixed to the building by being “ram-shot” into the concrete flooring and, in some cases, fixed to the walls. The bars have a length of 15' to 20' and are large, bulky and immobile. Their removal would damage the concrete flooring and reinforcing rods. The damage done by removal would necessitate the repair of concrete and reinforcing rods as well as the water pipes which are also fixed into the concrete. There are a total of four bags in the building and they all have specially bonded mica countertops.
Behind the bars are service areas for the use of bartenders and these areas include plumbing that rises up from the concrete as well as electrical wiring and sinks and metal shelving around the sinks, all of which is in one piece. The sinks are affixed to the floor in “ram-shot” fashion. Removal of an individual bar’s service area would have to be done by machine and accomplished in piecemeal fashion. Furthermore, removal would cause considerable damage to the concrete flooring.
*10 The restaurant equipment is composed of a metal table, dishwasher and stoves. The metal table has a dishwasher attached to it and both are attached to the building by means of pipes and nails shot into the floor. Extensive damage would be done to the flooring upon removal. The stoves are affixed to the concrete floor and wall in a “ram-shot” manner and they are also affixed by electrical connections as well as vents. They stoves are massive pieces of equipment, the removal of which would require considerable effort. Again, extensive damage would be done to the floors and reinforcing rods as well as to the wall upon removal of the stoves.
The soda fountains are located in the coffee shop and are similar in construction to the bars, with a serving counter on top, customer seats and a service area adjoining. The fountains are affixed to the building by being “ram-shot” into the foundation and their removal would cause damage to the flooring and reinforcing rods. The chrome parts of the soda fountains are attached thereto as squirters and soda dispensers, which, in turn, are annexed to the building as stated above.
The autobars are aids in the dispensing of alcoholic beverages by the drink. They are fashioned of metal and affixed by means of screws to wooden brackets, which are, in turn, attached to wall cabinets. The autobars, which were purchased separately from the brackets and the wall cabinets, have been removed on occasion for off-premises repairs.
The glass doors are hinged in the concrete foundation. Their removal could be accomplished by taking out the works above and below. What would be left, however, would be an incomplete building and the security of the building and all items of property contained therein would be seriously compromised to the point of rendering the building nonfunctional.
The exterior signs are located on the side of the building and upon a brick foundation in front of the building. The sign on the brick foundation could only be removed by destroying both it and the foundation, and such removal would cause extensive damage to the parking lot. The sign on the building is affixed *11 by means of concrete shot into the exterior wall. Removal would leave many holes in the exterior masonry necessitating extensive repairs to the wall.
The total construction costs of the building, including the 1969 extension, are approximately $1,004,000, while the costs of the 82 lanes, automatic pinsetters and other equipment directly related to the bowling activity itself, came to the approximate sum of $953,000.
Finally, I find, from the credible evidence in the record, that the bowling center is a single-purpose building. The costs of conversion of the bowling center, while not explicitly quantified in the evidence, are patently substantial. Those costs include partitioning, modification of electrical, heating and cooling systems, construction of new floors, remodeling the building front, removal of the lanes, lane furniture and pinsetters, as well as an interim loss of income. An alternative use is feasible only if the increase in value under the new use over the value of the property as a bowling center is greater than the cost of conversion. Rastrelli & Rinaldi, Encyclopedia of Real Estate Appraising, (3 ed.1978), “Appraisal of Bowling Centers,” 451, 458, 459. The only feasible alternative use appears to be a warehouse. Quite apart from the restriction to commercial use imposed by local zoning laws, warehouse use is impractical because the different levels of the original structure and the 1969 addition preclude efficient internal transport of materials.
The Business Personal Property Tax Act, N.J.S.A. 54:11A-1 et seq., excludes from taxation thereunder “goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto.” N.J. S.A. 54:llA-2(b)(2).
 The phrase, “goods and chattels so affixed to real property as to become part thereof,” may only be construed in terms of the basic law of fixtures, i. e., determination of the point at which chattels affixed to realty lose their identity as chattels and become part of the realty. Words and phrases in a statute having a well-defined common law meaning are to be *12 construed in the same sense under the statute when used in connection with the same or similar subject matter with which they were associated at common law. 2A Sutherland, Statutory Construction (4 ed.1973), § 50.03 at 277; Mascola v. Mascola, 168 N.J.Super. 122, 401 A.2d 1114 (App.Div.1979). The three-fold test by which fixtures are adjudged was set out in the leading case of Teaff v. Hewitt, 1 Ohio St. 511 (1853), wherein the Ohio Supreme Court concluded that a movable chattel loses its character as personalty and becomes a fixture passing with the realty when it is (1) physically affixed to the realty or some part thereof, (2) appropriated to the use or purpose of that part of the realty to which it is affixed, and (3) the party making the annexation intends a permanent annexation to the freehold.
Applying these principles to the facts of the instant case I find that all the items in dispute, with the exception of the autobars, were physically affixed to the realty or some part thereof, that the items were appropriated to the use or purpose of the part of the realty to which they were affixed and that a permanent annexation was intended.
Support for a finding of permanent annexation is found in the circumstances that the owner of the land and building, not a tenant, installed the disputed items of property thereon. When an owner purchases property and has it erected or installed upon realty which he owns, there is a marked tendency to regard the annexed property as realty. Wisconsin Dep’t of Revenue v. A. O. Smith Harvestore Products, Inc., 72 Wis.2d 60, 240 N.W.2d 357 (Sup.Ct.1976).
The conclusion of permanent annexation can also be based upon economic considerations. As indicated above, the costs of the 82 lanes, automatic pinsetters and other equipment directly related to the bowling activity itself came to approximately 95% of the construction cost of the entire building, including the 1969 extension. This negates any inference that removal and replacement of the disputed items was intended to be a common occurrence. San Diego Trust & Savings Bank v. San Diego Cty., 16 Cal.2d 142, 105 P.2d 94 (Sup.Ct.1940).
*13 Add to this the size, weight, intricacy of attachment and recognized useful lives of bowling alley equipment[1] and a finding of permanent annexation is unavoidable.
The credible evidence in the record impels the conclusion that the disputed items of furniture and equipment were physically attached to some part of the building and that the items were appropriated to the use of that part of the realty to which they were attached.
As indicated above, I find that the autobars, alone of all the disputed items, fail to meet the fixture test. The autobars are aids in the dispensing of alcoholic beverages by the drink. They are fashioned of metal and affixed by means of screws to wooden brackets, which are, in turn, attached to wall cabinets. The autobars were purchased separately from the brackets and the wall cabinets. The autobars have been removed on occasion for off-premises repairs, a fact which belies an intention to make a permanent annexation. The extent of physical attachment is minimal and the items are virtually fungible. I find the auto-bars to be personal property.
Much of the foregoing discussion centers upon the functional integration aspect of the realty-personalty classification issue. While a division of judicial authority exists on the question of whether functional essentiality to the conduct of a business is sufficient to classify an attached item as realty for tax purposes[2] the distinction in the instant case is meaningless as I *14 find, from the credible evidence in the record, that the bowling center is a single-purpose building.
There remains for determination the question of whether the disputed items are not “severable or removable without material injury” within the meaning of N.J.S.A. 54:llA-2(b)(2).
“Material injury” in the context of N.J.S.A. 54:11A-2(b)(2) means that degree of damage to real estate which renders it nonfunctional without extensive repair, redesign or replacement of the removed item. This is substantially the test of functional and economic essentiality which has been adopted by the courts of New York, California and Ohio in characterizing realty or personalty for tax purposes. Zangerle v. Standard Oil Co. of Ohio, 144 Ohio St. 506, 60 N.E.2d 52 (Sup.Ct.1945); City of Lackawanna v. State Bd. of Equaliza, and Assess., 21 App.Div.2d 318, 250 N.Y.S.2d 369 (App.Div.1964), mod. on other grounds 16 N.Y.2d 222, 264 N.Y.S.2d 528, 212 N.E.2d 42 (Ct.App.1965); Consolidated Edison Co. of N. Y. v. City of N. Y., supra; San Diego Trust & Savings Bank v. San Diego Cty., supra. In the City of Lackawanna case the court was called upon to determine the tax character of certain machinery and equipment used in a steel plant pursuant to § 102(12)(f) of the New York Real Property Tax Law, which exempted from real property taxation machinery which was not essential for a building’s support and which was “removable without material injury” to the building. The court found the exemption inapplicable to the disputed items, stating:
... Nor do we have any difficulty in finding that the blast furnace group, the open hearth furnace group, the coke oven group and the soaking pit furnace group constituted real property within the meaning of the statute. ... The statutory test is not the intent of the owners as in the typical common law fixtures problem but movability. And while there is some evidence that despite the enormity of the items involved, movement of some of these is physically possible, as from a theoretical standpoint any structure ever built might conceivably be moved, the record clearly indicates that in each instance such movement is economically unfeasible. We construe the test under subdivision 12(f) to encompass both economic as well as physical considerations .... and thus, here, *15 where the economic considerations so negate movement as a matter of practicability, the property is properly held to be real property ... [21 A.D.2d at 320-21, 250 N.Y.S.2d at 371]
The record reveals that removal of the bowling lanes and equipment and the furniture and equipment directly related thereto would necessitate not only extensive repairs to the building but also comprehensive redesign of the structure. I draw the same conclusion with respect to the furnishings and equipment in the restaurant and cocktail lounge. The settees were specifically constructed to fit the contours of the odd-shaped walls in the lounge. They were “ram-shot” into the floor and nailed to the walls. Their removal could only be accomplished with the aid of three or four men and a crowbar and would necessitate rebuilding both the concrete floor and the walls. Extensive damage to the concrete floor and other parts of the structure would also result from removal of the bars and their bonded mica countertops, the plumbing, sinks and metal shelving in each bar’s service area, the restaurant equipment (stoves, dishwashers, and metal tables), the soda fountains and ice machines.
I find that all the aforementioned items cannot be removed without material injury to the realty.
There remain for examination the glass doors, the two signs affixed to the external walls of the building and the illuminated sign in the parking lot.
The glass doors, located at the building’s entrance, are hinged in the concrete foundation below floor level. Their removal could be accomplished by taking out the works above and below. The extent of physical attachment indicates an intention to make the doors a permanent part of the structure. They are identical in functional essentiality to bank vault doors, which have been held to be part of the realty for tax purposes. Bostian v. Franklin State Bank, 1 N.J.Tax 270 (Tax Ct.1980), aff’d o. b. Superior Court, Appellate Division, Docket A 3219-77, May 21, 1980 (unreported); San Diego Trust & Savings Bank v. San Diego Cty., supra. In the latter case the court said:
The mere fact that said doors can be removed without material damage to the vaults by chipping away with a chisel, jack hammer, or compressed air hammer, *16 the cement grouting which attaches them to the vaults, does not alone establish their character as articles of personality. A door or window in an ordinary dwelling house can be removed with very little damage to the realty. It also may be replaced by one of different design or by a new one if the former should become broken or defective, but no one would contend that either was not a part of the realty by reason of these facts alone. [105 P.2d at 98]
The removal of the glass doors would seriously compromise the security of the building and all items of property contained therein to the point of rendering the building nonfunctional. The glass doors are part of the realty.
The signs attached to the external walls of the building are physically attached with concrete. As these signs proclaim the nature of the activity conducted within the single-purpose building to which they are affixed, their functional integration with the structure is indisputable. Their removal would leave many holes in the walls. As indicated above, removal of the illuminated sign, embedded in its brick foundation, would result in its destruction as well as material injury to the paved parking lot.
The parties will exchange computations consistent with this opinion, pursuant to R. 8:9-3.

Bowling equipment (lanes, pinsetters, etc.) has a useful life of 20 years, bowling center restaurant equipment a somewhat shorter life. Rastrelli & Rinaldi, op. cit., 451, 458.

The courts of Ohio and. New York distinguish between property devoted to the conduct of a business and property indispensable to the realty itself, property in the latter category being characterized as fixtures. Roseville Pottery v. Cty. Bd. of Revision, 149 Ohio St. 89, 77 N.E.2d 608 (Sup.Ct.1948); Consolidated Edison Co. of N.Y., Inc. v. City of N.Y., 44 N.Y.2d 536, 406 N.Y.S.2d 727, 378 N.E.2d 91 (Ct.App.1978). The courts of California and Illinois, on the other hand, make no such distinction. They conclude that functional essentiality (given some degree of physical attachment) to the conduct of a business is sufficient to classify an item as real property for tax *14 purposes. Trabue Pittman Corp. v. Los Angeles Cty., 29 Cal.2d 385, 175 P.2d 512 (Sup.Ct.1946); Ayrshire Coal Co. v. Property Tax Appeal Bd., 19 Ill.App.3d 41, 310 N.E.2d 667 (Ct.App.1974).