CONLEY, J.T.C.
This consolidated proceeding presents the issue of whether certain business property should be subject to taxation as business personal property by the State Division of Taxation or as real property by a local taxing district. The primary property involved in this matter is an immense steel structure used for the production of asphalt and known as an asphalt plant. The tax years in question are 1974 through 1979.
In 1974 and 1975 plaintiff paid business personal property taxes to the State based on the original cost of the plant. Beginning in 1976 defendant borough began assessing the plant as real property. Plaintiff preserved its options by challenging both types of assessment. It claimed a business personal property tax refund for 1974 and 1975 and appealed from the Director’s denial of that claim. It also appealed from judgments entered by the Middlesex County Board of Taxation in 1976 through 1979 affirming the local assessment, which for each year was as follows: Land — $84,000; Improvements — $328,300; Total — $412,300. Plaintiff does not challenge the borough’s *275 assessment in terms of valuation but contends that most of the assessment allocated to improvements was imposed on business personal property that could not be taxed by South River.
The cases involving the two separate taxes were scheduled for pretrial conference at the same time because, of their necessary interrelationship and the court consolidated them for trial so that each taxing authority could defend its assessment not only against the taxpayer but also against the other taxing authority. All parties are in agreement that the asphalt plant and/or its component parts should be subject to either the business personal property tax or the local property tax and that the same property should not be taxed by both the State and the municipality. Plaintiff in this litigation takes the position that the plant should be treated as business personal property except to the extent that the parties have agreed to the contrary regarding certain items which will be mentioned later.
Asphalt plants were described at trial by detailed testimony and by reference to numerous photographs, manufacturers’ manuals and brochures, and blueprints. In essence, an asphalt plant functions as a very large machine to mix sand and stone aggregate with hot liquid asphalt. The end product is a black paving substance known as bituminous concrete and more commonly referred to simply as asphalt. After the materials are mixed in the plant according to a prescribed formula, the hot asphalt is loaded into trucks and delivered immediately to a construction site for application while still warm.
An asphalt plant is frequently located on a sizable property, such as a quarry or a highway construction site. Plaintiff’s plant was located on an eight-acre tract. Several acres of the tract were devoted to stockpiles of sand and stone that were as high as 60 feet. The size of the piles remained fairly constant because they were replenished as material was used. The asphalt plant itself can be an enormous structure. Plaintiff’s plant at South River is almost 50 feet in height and weighs up to 50 tons. A plant can be operated by three people: one person operating a front-end loader to feed aggregate into storage *276 bunkers or bins; one person in the batch house, which is the control room for the machinery of the plant, and one person in the scale house to operate the 50-ton truck scale to measure the hot asphalt when it is dropped from the plant into the trucks waiting below at ground level. On plaintiff’s site the batch house and scale house are constructed of concrete block and the parties agree that these two structures should be taxed as real property.
Plaintiff has operated an asphalt plant at its site in the borough of South River since May 1965. Plaintiff’s first plant at the site was known as a Madsen. Its present plant is known as a McCarter. The McCarter plant is a system comprised of several components. There are large bunkers or bins on the ground which hold supplies of stone and sand for loading into the plant. An elevator or conveyor belt feeds cold stone and sand aggregate from the bins into a large, rotating cylinder known as a dryer. The dryer is supported by a large frame that is connected to concrete footings by anchor bolts. The dryer contains a burner which heats and dries the aggregate as the dryer rotates. A very large air pollution control system collects exhaust from the dryer, and later from the “hot elevator,” and deposits the waste in large filters or “bags.” From the dryer the aggregate is passed down a chute to the hot elevator, which houses a series of buckets that take the heated aggregate to the top of a large tower and dump the sand or stone onto five decks of screens. The screens are located over hot storage bins and permit the desired sizes of aggregate to fall into the bins. A weigh box, which is basically a scale, is beneath the hot storage bins and weighs the aggregate when it is drawn from the hot bins. A storage tank for liquid asphalt, which contains its own burner to heat the oil, is connected to the tower by three-inch pipe. Hot asphalt oil is fed through the pipe to an asphalt weigh bucket, which measures that substance to insure the appropriate mix. A pug mill located in the tower beneath the weigh box and weigh bucket mixes the measured quantities of aggregate and hot asphalt to make bituminous concrete, the end product. Various mineral fillers can be added to the mixture of *277 aggregate and hot asphalt from a separate mineral filler silo and elevator that connect to the tower. The hot bituminous concrete is released from the pug mill in the hot storage silo by gravity directly into trucks below. The trucks are weighed on a truck scale before they leave the site. The truck scale mechanism is a concrete and steel bridge or deck that rests by gravity on nine metal fulcrums that are themselves bolted to footings in the bottom of the five-foot deep concrete pit. The other notable part of the McCarter plant is an electrical substation that provides the plant with power. It consists of three large transformers and as much as 250 feet of wire and conduit, some of which is buried.
Plaintiff’s Madsen plant was essentially the same as the McCarter plant except for the following differences: its batch house was part of the superstructure of the plant itself and was not a separate concrete block building; the air pollution system was a wet control rather than a dry control system; the liquid asphalt tank was partially buried, whereas in 1978 it was set on a concrete foundation, and all of the pilings under the Madsen plant were wood whereas some of the pilings under the McCarter plant were steel.
Site conditions have a great deal to do with the manner in which any asphalt plant is affixed to the ground, and the process of securing a plant may be elaborate or not. If the subsoil is sufficiently stable, less of a foundation is required. Plaintiff’s plant was not set directly on the ground but was built on approximately 155 cubic yards of concrete slabs. These lay under the batch house, the scale house, the fuel oil storage and asphalt storage tanks, the hot storage silo and the cold feed bunker. In addition to the concrete slabs there were approximately 35-40 cubic yards of concrete footings, each averaging four cubic yards in size, and more than 50 wooden and steel piles approximately 20-25 feet long, buried to depths of up to 68 feet.
Some asphalt plants are described as “portable” because some of the major components, such as the storage bunkers, dryers, hot elevators, air pollution systems and portions of the main *278 tower are built with axles and wheels so that they can be transported from site to site. According to one witness, portable asphalt plants are more common in the West and Midwést where stationary plants are not located as near to construction sites as they are in New Jersey. Plaintiffs plants during the years involved here were stationary plants rather than portable, but modifications can be made even to a stationary plant to convert it to a portable plant. It is significant that asphalt plants, either in component parts or as whole units, are commonly bought and sold on the second-hand market, primarily through trade journals. In fact, the Madsen plant erected on plaintiff’s site was not a new plant. It had been in operation for five years at a site in New Shrewsbury, Monmouth County, before plaintiff moved it to South River.
A description of the process involved in moving plaintiff’s plant in 1965 and of the transition from the Madsen to the McCarter plant in 1968 and 1969 is instructive. The Madsen plant in New Shrewsbury was attached to its footings by a series of large anchor bolts and nuts. Anchor bolts are shaped like the letter “L.” When installed, the shorter length of each bolt is set in a concrete footing or pier. When a structure is to be secured or “anchored” by use of an anchor bolt, a structural member is set over the bolt so that the protruding vertical portion of the bolt fits through a hole in the structure itself. The structure is then fastened to the anchor bolt by a nut screwed down onto the bolt. The anchor bolts used to hold down plaintiff’s asphalt plant were 1 to IV2 inches in diameter. The vertical legs of the bolts were as much as 22 inches long, part of which protruded from the concrete footings. The shorter legs (completely set in concrete) were up to 10 inches long. A total of 74 such bolts were used to hold down plaintiff’s plant.
When plaintiff moved the Madsen plant from New Shrews-bury to South River the structure had to be removed from its anchor bolts. Approximately four of the anchor bolt nuts were removed with a wrench alone; the others had to be removed with a torch. After the structure had been freed from the anchor bolts, the component parts of the Madsen plant itself *279 were unbolted. These were then lifted by cranes and loaded onto flatbed trucks to be transported to South River. At the South River site the component parts of the plant were lifted by crane from the trucks and set onto concrete block footings that were set on pilings. The component parts were first secured to the anchor bolts on the footings with nuts, and the component parts were then bolted together. The approximate cost of relocating the Madsen plant from New Shrewsbury to South River was two million dollars.
Plaintiffs Madsen plant remained at the South River site until January 1979 when it was transferred to another site. At South River plaintiff replaced the Madsen plant with a McCarter plant in two stages since the components of the two asphalt plants were basically interchangeable. In January 1978 plaintiff replaced the Madsen dryer and air pollution system with McCarter components and also added a mineral filler silo. The remaining parts of the Madsen plant were replaced in January 1979. Although the Madsen and McCarter plant parts were basically the same, they were arranged differently and site modification was required when they were exchanged. When the Madsen plant was fully replaced, 95% of its footings were destroyed — the remainder were used as footings for the McCarter plant. Additional footings were, of course, poured to support the McCarter plant. The footings that were destroyed were crushed with a steel dropball and carted away. When the footings were removed, the wooden piles upon which they had been built were uprooted when possible; otherwise they were cut off below grade and left in the ground or used as pilings for the McCarter plant. Of all the pilings under the McCarter plant, 8% were steel; these were placed under the main tower of the asphalt plant. To the extent that holes were made in the ground when footings were destroyed and pilings were removed, the holes were filled to grade level with soil available at the site.
The other significant features at plaintiff’s South River site during the years involved in this case were enormous retaining walls. The walls were constructed of concrete blocks each measuring approximately 2' by 4' by 6' and each weighing three *280 tons. The blocks were typically stacked on top of each other and formed into walls. Three separate walls ran along the river next to the asphalt plant and along the cold feed bunker. The walls were each approximately 10' high and as long as 138'. The blocks used to form the walls were made from leftover concrete and were moved into new configurations from time to time with a front-end loader. Plaintiff sold concrete blocks on the open market if it had more than it needed for retaining walls.
As stated at the outset, the issue presented by this case is whether plaintiff’s asphalt plant should be taxed as business personal property by the State or as real property by the Borough of South River. Several statutes are relevant. N.J. S.A. 54:4-1 states in pertinent part:
All property real and personal [1] within the jurisdiction of this State not expressly exempted from taxation or expressly excluded from the operation of this chapter shall be subject to taxation annually under this chapter.
The taxing district cites this statute as authority for taxing the asphalt plant as real property. The Director of the Division of Taxation and plaintiff both rely on N.J.S.A. 54:11A-3, which states:
All personal property used in business in this State, not expressly exempted from taxation or expressly excluded from the operation of this act, shall be subject to taxation annually under this act. Such property shall be valued and assessed by the director at the taxable value hereinafter prescribed. Property omitted from any assessment may be assessed by the director within such time and in such manner as shall be provided by this act.
The following portions of N.J.S.A. 54:llA-2 are also applicable:
(b) “Personal property used in business” shall mean tangible goods and chattels used or held for use in any business, transaction, activity or occupation conducted for profit, but shall not include:
(2) goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto; .... [Emphasis supplied]
*281 Plaintiff cites the latter statute as authority for the proposition that the asphalt plant in question should be treated as personal property, since, in plaintiff’s view, removal of the plant would not cause “material injury” to the real property.
N.J.S.A. 54:11A-2 and N.J.S.A. 54:11A-3, both of which are an integral part of the Business Personal Property Tax Act, were construed by the New Jersey Supreme Court in Bayonne v. Port Jersey Corp., 79 N.J. 367, 399 A.2d 649 (1979), the controlling case on this issue. Bayonne dealt with three cranes used to load and unload container ships. Each crane weighed approximately one million pounds but each was “readily movable” on railroad-type rails. The court held that the cranes were personal property for purposes of the Business Personal Property Tax Act. In the course of its decision the court observed that this act had preempted the taxation of business personal property by local taxing districts. The court quoted from National Lead Co. v. Sayreville, 132 N.J.Super. 30, 35, 331 A.2d 633 (App.Div.1975), to the following effect:
. .. the assessor in each taxing district now has to determine in appropriate cases what is includible as taxable real property, particularly in the case of fixtures which, in certain circumstances, might by annexation be assimilated into the realty. [79 N.J. at 371, 399 A.2d 649]
The question raised by this proposition is how an assessor should determine whether property is realty as opposed to personalty. In answering this question the court in Bayonne discarded the so-called “institutional doctrine,” the then current method of distinguishing realty from personalty for tax purposes. Instead, it substituted the “material injury” test which had been traditionally applied by other jurisdictions to determine whether chattels had been affixed to real estate. Distinctions between these two tests are, of course, critical and should be discussed at this point.
The institutional doctrine was a variation of the material injury test set forth in the Uniform Conditional Sales Act (N.J.S.A. 46:32-1 to 33), which preceded and was repealed by the Uniform Commercial Code, N.J.S.A. 12A: 1-101 et seq. The doctrine was unique to New Jersey. Bayonne, supra at 373, *282 375-376, 399 A.2d 649. The Supreme Court in Bayonne summarized the doctrine as follows:
... the inquiry as to whether property was severable without material injury to the freehold was to be determined not by a test of physical injury, as the [Uniform Conditional Sales Act] seemed to say, but rather by a test of functional or economic injury. [Id. at 375, 399 A.2d 649]
Pertinent inquiries with regard to the institutional doctrine were: (1) whether the chattel was permanently essential to the completeness of a structure, and (2) whether severance of the chattel would prevent the structure from being used for the purposes for which it was erected. Smyth Sales Corp. v. Norfolk B. & L. Ass’n, 116 N.J.L. 293, 184 A. 204 (E. & A. 1936), cited in Bayonne, supra 79 N.J. at 374, 399 A.2d 649.
In Bayonne the court examined the legislative history of the Business Personal Property Tax Act and concluded that the institutional doctrine was no longer viable. The court held as follows:
The meaning that the phrase “material injury” had been given in the great majority of those states which had adopted the Uniform Conditional Sales Act was a test of irreparable or serious physical damage. “Serious physical damage to the property was interpreted as removal of something essential to its support.” 5 Powell on Real Property, § 660.2 at 96.15 (1977). “[Ajnything could be removed unless the removal, in effect, destroyed the structure.” 2 G. Gilmore, Security Interests in Personal Property, supra, § 30.2 at 804. We conclude, therefore, that the exclusion of
goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto
appearing in N.J.S.A. 54:11A-2 should, looking solely to the language of the statute, be taken to mean only those chattels the removal of which will do irreparable or serious physical injury or damage to the freehold. [Id. at 377-378, 399 A.2d 649]
The court supported its conclusion with a finding that the Legislature in enacting the new act intended “to create in New Jersey a fiscal climate that will contribute to the attraction of industry.” Id. at 380, 399 A.2d 649. To achieve this purpose the Legislature removed the burden of local property taxation from machinery and equipment used in business. Thus, the court held that the cranes were not subject to local taxation.
In the present case defendant South River does not dispute the authority of Bayonne. However, it maintains that other cases have interpreted Bayonne in such a way that plaintiffs *283 asphalt plant should be taxed as real property. Defendant first cites Koester v. Hunterdon Cty. Bd. of Tax., 79 N.J. 381, 399 A.2d 656 (1979), decided the same day as Bayonne.
In Koester the New Jersey Supreme Court held that certain mobile homes were taxable as real property. The court cited various factors, such as sewage, water, lighting, heating and air conditioning, which made the mobile homes similar to conventional homes. Therefore, the court held that mobile homes could be taxed like conventional homes. South River argues that the court in Koester expanded its view of improvements that could be taxed as realty to include facilities or structures placed on a site with a view toward their remaining there permanently, especially when the structures receive municipal services identical to those received by their taxpaying neighbors. Recognizing the “material injury” test set forth in Bayonne but citing what it calls the “intent and use” test of Koester, South River lists various attributes of plaintiff’s asphalt plant, such as improvements affixed to concrete, stockpiles of aggregate, storage tanks, in-ground scales and retaining walls, which, in this defendant’s view, make the asphalt plant akin to mobile homes and thus taxable locally as real property.
South River overlooks an important statement in Koester: Statutory amendments have largely confined personal property taxation to certain kinds of property used in business. See N.J.S.A. 54:4-9 et seq.; Nelson Cooney & Son, Inc. v. Tp. of So. Harrison, supra, 57 N.J. [384] at 389 n. 2 [273 A.2d 33]. These amendments do not concern us here for admittedly we are not dealing with “personal property used in business.” City of Bayonne v. Port Jersey Corp., 79 N.J. 367, 372 [399 A.2d 649] (1979). Our concern is simply whether our broad statutory provisions, which embody no pertinent exemptions and clearly subject all conventional homes to local real property taxation, apply equally to mobile homes of the type found at Solitude Village. [Id. at 391, 399 A.2d 656]
This statement makes it clear that “personal property used in business” must be carefully distinguished from other property. Since the mobile homes were not business property no mention was made in Koester of the “material injury” test set forth in Bayonne. This factor is especially important since both cases were handed down on the same day. Thus, Koester is relevant here primarily for the point that a distinction must be made *284 between personal property in the “business” sense and personal property in the “non-business” sense. Accordingly, the criteria used by the court in Koester to define taxable real property do not necessarily apply in the present case because plaintiff’s asphalt plant was clearly business property.
The next case relied on by defendant South River is Bostian v. Franklin State Bank, 1 N.J.Tax 270 (Tax Ct.1980), aff’d o.b. 179 N.J.Super. 174, 2 N.J.Tax 391, 430 A.2d 1140 (App.Div.1980). In that case Judge Crabtree held that two bank-vault doors and the tellers’ counters in a commercial bank building should be taxed as real property even though he found them to be movable. The court found that both the vault doors and the counters were “functionally and physically integrated with the single-purpose bank building and formed part of the realty.” 1 N.J.Tax at 277. The court based its holding on the following legal proposition:
Intent and use, not the manner of physical attachment, are the main determinants of whether or not certain items are taxable as realty or personalty. Koester v. Hunterdon Cty. Bd. of Tax., supra. [Id.]
Compare, H.J. Bradley, Inc. v. Taxation Div. Director, 4 N.J.Tax 213 (Tax Ct.1982), involving a sales tax assessment on the installation of tangible personal property.
In the present case defendant South River relies heavily on Judge Crabtree’s analysis and especially on the following test enunciated in Bostian:
While, as the Teaff[2] case indicates, the intent of permanent annexation is indispensable to a determination that a chattel has become a fixture, that intention must be judged by the physical facts or reasonably manifested outward appearances. Put another way, the intention test, objectively applied, means: what would a reasonable person consider part of the realty so as to pass with a deed or mortgage? This test promotes uniformity of taxation by permitting the assessor to rely upon external appearances. [Id. 1 N.J.Tax at 276]
In attempting to apply the Bostian test, the taxing district points to numerous aspects of plaintiff’s asphalt plant which allegedly show an intention to make the plant and its improvements permanent.
*285 Judge Crabtree also rendered an opinion in Wiesenfeld v. Taxation Div. Director, 3 N.J.Tax 3 (Tax Ct.1981), which involved business personal property tax assessments on bowling lanes and equipment. In that opinion the court held that most of the items which had been assessed by the Director were part of the realty rather than personalty. Among the items with respect to which the court set aside the business personal property tax assessments were pinsetters, ball returns and terminals, spectator seating that was not attached to the floor, cocktail lounge settees, countertops and bars, sinks, additional restaurant equipment, glass doors and exterior locational signs on and near the building. The court found that only metal “autobars” used in the dispensing of alcoholic beverages by the drink were taxable business personal property. In Wiesenfeld the court followed essentially the same approach it had used in Bostian, although in Wiesenfeld the court considered more fully the question of material injury to the freehold.
I respectfully disagree with the reasoning and analysis of Judge Crabtree in Bostian and Wiesenfeld. The Supreme Court established the law of this State as it pertains to the taxation of business personal property in the Bayonne case. By relying as he did on Koester and on authorities from other jurisdictions, Judge Crabtree, in my opinion, did not deal with the point, extremely important in the present case, that “business” property and “non-business” property are treated differently in New Jersey with respect to classification as realty or personalty for tax purposes. As noted above, the court itself in Koester distinguished its holding in that case from Bayonne because the mobile homes in Koester were not business property. Therefore, although Judge Crabtree on the facts of his cases adopted and applied a test of “intent and use,” I find the appropriate test in the present case to be the “material injury” test as set forth in Bayonne.
The argument as to what is realty and what is personalty will go on forever. The facts in each individual case are obviously important, but the first inquiry in these cases is what kinds of *286 facts will be relied on to make the determination. In Bayonne the court discerned a legislative intent in favor of treating business property as personal property, severely limiting the type of facts which would be determinative. It did not divide and construe N.J.S.A. 54:llA-2(b)(2) into two separate parts, as was done in Bostian and Wiesenfeld. Rather, the court treated the following phrase as a whole:
... goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto; ....
Thus, according to the Supreme Court, fixtures would certainly be exempt from the business personal property tax, but “fixtures” would be only those things whose removal would do “irreparable or serious physical injury or damage to the freehold.” Bayonne, supra, 79 N.J. at 378, 399 A.2d 649. It follows from this that the facts which might ordinarily be determinative of the fixture issue, for example in the mobile home situation of Koester, might well be irrelevant in the business property context, and the “basic” law of fixtures as applied in Bostian and Wiesenfeld might also be inapplicable.
The court’s opinion in Bayonne does not provide much explicit guidance with regard to the facts that are relevant to a determination of whether certain business property is personalty or realty. However, the court noted that the language found in N.J.S.A. 54:11A-2(b)(2) is based directly on the Uniform Conditional Sales Act. The court said:
Since the Legislature, in drafting the tax act, has chosen this particular language from a prior statute, it behooves us to examine the meaning and interpretation given to the words as used in the earlier enactment as a guide to their significance in the more recent legislation. [Id. at 373, 399 A.2d 649]
Therefore, it seems fair to conclude that previous interpretations of the language as it appeared in the Uniform Conditional Sales Act should also apply to any interpretation of the language as it appears in the Business Personal Property Tax Act.
As one commentator has observed, the words “material injury to the freehold” as found in the Uniform Conditional Sales Act were interpreted in two ways. The minority rule was the “institutional doctrine” (discarded by the court in Bayonne) and *287 the majority rule was the New York rule. According to that rule,
... serious physical damage was necessary for there to be a “material injury to the freehold.” In this regard, serious physical damage to the property was interpreted as removal of something essential to its support. If the conditional seller could sever the fixture from the land without causing such damage, he could reclaim the goods. [5 Powell on Real Property, § 660.2 at 57A-7 (1980) ]
This rule, the majority rule when the Uniform Conditional Sales Act was still in force, is clearly the rule adopted by the court in Bayonne. Although this rule is highly abstract, as is any definition of “fixture,” it can be restated for clarification and analysis in the following manner:
A fixture, for purposes of business property taxation, is a chattel which has become affixed to real property in such a way that its removal would do irreparable or serious physical injury or damage to the freehold by taking away something essential for support.
It is immediately apparent that this test is more strict than the “traditional” test stated in Teaff, Bostian and Wiesenfeld. It requires something more than mere physical annexation with intent. As stated in Eager, The Law of Chattel Mortgages and Conditional Sales (1941), chattels attached to a building were generally divided into three classes under the Uniform Conditional Sales Act to determine the validity of any particular chattel mortgage. Id. at 93-97 and 420 431. The first class concerned those things which had a “definite character as movables.” These items remained personal property even after annexation and despite any agreement. The second class concerned those things which became realty “as a matter of law either by virtue of the nature of the goods or chattels or by virtue of the manner of annexation.” Id. at 94. Of this second class, Eager states:
Where fixtures or articles, though originally personalty in nature, are attached to or become a part of a building or lands in such a manner that they may not be detached without themselves being destroyed or materially injured, or are so incorporated into a building that the removal thereof will affect the security of the building itself or a substantial part thereof, the character of such fixtures or articles as personal property is finally ended. A chattel mortgage executed upon such fixtures or articles, whether before or after the same become attached to the realty, is invalid and unenforceable as a chattel mortgage when they become or are a part of the realty. [Id. at 94]
*288 The remaining class consisted of those chattels which fell between the other two classes and which could be personal property or real property depending on how the interested parties agreed. Of this class, Eager states:
Even though the fixtures which are attached or which are to become attached to a building or land are of such nature, or the mode of annexation is of such character, that they would under ordinary circumstances become part of the realty, the rule is that they may, by agreement of the parties, express or implied, become or retain their character as chattels, provided they are removable without destruction and without material injury to the freehold, and provided, some innocent third person is not thereby prejudiced. [Id. at 94-95; emphasis supplied]
An analysis of these three classes of chattels leads to the following conclusions with regard to fixtures under the Uniform Conditional Sales Act:
(1) To become a fixture, a chattel had to be physically annexed to real property in such a way that its removal would cause “material detriment to the walls, ceilings or floors of the building.” [Id. at 97];
(2) The use or purpose of the chattel as it related to the use or purpose of the realty to which the chattel was attached was not relevant, since the manner of physical annexation was the most important consideration;
(3) Once a chattel was affixed to real property in such a way that its removal would cause “material injury” to the freehold, it could no longer be the subject of a chattel mortgage, and this was so despite any agreement of the parties to the chattel mortgage — thus, intent became nearly irrelevant.
An additional point should perhaps be made about intent. Under the Uniform Conditional Sales Act three parties might be involved in the fixture situation: (1) the owner of real property; (2) the owner/seller of the personal property (fixture) and (3) the buyer of the personal property. Among these three parties the owner of the real property to which the fixture (as defined by the “material injury” test) was attached would always have title unless he agreed before-hand that the chattel could later be removed. This was the only situation in which the intent of the parties mattered once the chattel was attached, and this situation represented (at least in New York) an exception to the common law under which intent or agreement was irrelevant. See Eager at 94 and 420-431; see, especially, n. 1 at 424. In tax cases also, intent is irrelevant when the material injury test of the Uniform Conditional Sales Act is applied, as mandated by the court in Bayonne. Thus, whether any chattel is realty or *289 personalty for business tax purposes should be determined solely on the basis of how it is attached to the business real property. See Bank of America National Ass’n v. La Reine Hotel Corp., 108 N.J.Eq. 567, 156 A. 28 (Ch. 1931), for a comprehensive summary of the New Jersey law on fixtures prior to and under the Uniform Conditional Sales Act.
Insofar as the law applies to the facts in the present case, it should first be emphasized that all the property in question is clearly business property. Thus, any mention of real or personal property must be understood to mean business real property and business personal property. Secondly, since the parties have agreed that the batch house and the scale house, both made of concrete block, are real property, it remains to be determined only whether the asphalt plant and the balance of the property surrounding and supporting it are real or personal property.
With regard to the asphalt plant itself, I find that either of plaintiff’s plants could be removed without “material injury to the freehold,” as that phrase was construed in Bayonne. In that case, material injury was understood to mean “irreparable or serious physical injury or damage.” Movability was also a key consideration in the court’s decision because the cranes involved in that case were on rails. This concept is clearly related to the traditional notion of realty being permanent and immovable, and of personalty being movable. In the present case, despite the municipality’s' attempts to show that great amounts of expense, effort and time were involved in moving a plant, or that plaintiff intended its plant to be permanent, the fact remains that component parts of a plant could be unbolted and replaced with similar pieces and that an entire plant could be and was transportable. The municipality did not succeed in showing that so-called “portable” asphalt plants are vastly different from “stationary” plants. Testimony also indicated that a plant does not need an elaborate foundation if soil conditions are stable enough. Thus, given adequate stability and proper balance, a plant could in effect rest on the ground. The fact that both of plaintiff’s plants were built on and attached to an *290 elaborate set-up of pilings and footings is not an indication of either plant’s immovability. The simple fact remains that an asphalt plant can be freed from its foundation with a wrench (or a blowtorch when anchor bolts and nuts are rusted or otherwise frozen) and it can be removed without serious damage to itself or to the land beneath it. This conclusion applies to plaintiff’s cold feed bins, front end loader, dryer (and related equipment), hot elevator, screens, hot bins, weigh box, weigh bucket, pug mill, mineral filler silo, mineral filler elevator, bag house (and related equipment) and hot storage silo (and related equipment). All of these items should be treated as business personal property.
I am aware in a more general context that many types of structures could be removed from their foundations and transported to another site without serious damage to either building or land. This is certainly done on occasion with an ordinary house, for example. This is not to say, however, that a house would be personal property and not taxable locally as real property. In the first instance, a house is typically not business property and therefore would be taxable pursuant to N.J.S.A. 54:4-1 et seq.; it would not in the usual situation conceivably be exempt as business personal property under N.J.S.A. 54:11A-1 et seq. Secondly, even if a house or some other structure were clearly business property, it would be taxable locally as real property unless it could be demonstrated that in the normal course of its use as business property it could be removed from its foundation without material injury to the freehold.
It is not difficult to imagine, however, that a readily transportable house-like structure, such as a mobile home, could be undeniably business property and thus could qualify as business personal property within the Bayonne rationale. This phenomenon might at first blush appear contrary to the court’s decision in Koester, in which residential mobile homes were held to be taxable as real property rather than personal property. However, as discussed above, the distinction must always be made in the context of taxable real and personal property *291 between business property and nonbusiness property. The Legislature has broad power to create classifications in the field of taxation. McKenney v. Byrne, 82 N.J. 304, 315-316, 412 A.2d 1041 (1980). The distinction between uses of property for business and nonbusiness purposes is basic and traditional. It therefore could be not only conceivable but also perfectly appropriate for two essentially similar mobile homes to be treated differently for tax purposes, depending on the nature of their use: a residential mobile home might be taxable as real property as in Koester and a mobile home used for a business office might be taxable as business personal property.
In the present case a resolution of the appropriate treatment of an asphalt plant and its component parts does not resolve the entire question. The nature of the foundation of the plant requires a different result. All parties agree that any foundation is in many ways unique to its site since site conditions dictate the type and strength of the foundation. The record in this case established that plaintiff’s foundation was relatively elaborate, having been built on steel and wood piles driven deep into the ground. Removal of the piles was in most cases totally impractical. The pilings, footings and concrete slabs that were removed were invariably destroyed in the process. I think it is clear that all these elements of the foundation for the asphalt plant became a part of the realty and are taxable as such.
A final consideration concerns the other items of property at the asphalt plant site. These are the stockpiles, asphalt and oil storage tanks, conduit, the electrical substation, the truck scale and pit and the long retaining walls made of blocks of concrete. Again, material injury to the freehold upon the removal of any of these things from the site must be examined. In applying the analysis which was used in connection with the plant itself, I conclude that the stockpiles, the asphalt and oil storage tanks, all conduit, the electrical substation, the truck scale and the retaining walls are all personal property. They are in the nature of movable chattels and their removal would *292 cause no damage to the real estate or to the items themselves. However, the foundations under the tanks and the truck scale pit are of the nature of real property and should be treated in that manner.
For the reasons set forth above, the Director’s denial of plaintiff’s refund claim for business personal property taxes is affirmed. The local property tax assessments by South River Borough will be modified, based in part on computations appearing on the assessor’s property record card and in part on testimony at trial. The modification will be as to the assessment on improvements, which will be limited to the batch house and scale house ($9,000), concrete footings and slabs ($7,000) and pilings ($5,000). Accordingly, the local property tax assessment for all years at issue will be as follows:
1976, 1977,1978,1979
Land - $ 84,000
Improvements - 21,000
Total - $105,000
The Clerk of the Tax Court will enter separate judgments in the business personal property tax and the local real property tax matters.

Personal property taxable under this chapter includes only tangible goods and chattels, exclusive of inventories, used in the business of telephone, telegraph and messenger systems subject to tax under N.J.S.A. 54:30A-16 et seq.

Teaff v. Hewitt, I Ohio St. 511 (Sup.Ct.1853).